[No. 27172.    Department Two.    November 7, 1938.]

VIOLET TOIVONEN, *as Administratrix, Respondent,* v.
MOSES TOIVONEN, *Appellant.*[1]

*Shorett, Shorett & Taylor,* for appellant.

*C. E. Hughes,* for respondent.

[1]Reported in 84 P. (2d) 128.

GERAGHTY, J.—This action was brought by the plaintiff, as administratrix of the estate of her deceased husband, Fredrik E. Toivonen, to recover from the defendant, Moses Toivonen, father of Fredrik, the amount of a balance in a joint account in the Washington Mutual Savings Bank of Seattle, in the name of "Fred Toivonen or Moses Toivonen," and withdrawn by the defendant after his son's death. The cause was tried to the court, and findings made favorable to the plaintiff. A judgment was entered in her favor and against the defendant for $776.48, the amount withdrawn by him from the account. The defendant appeals.

Fredrik Toivonen was married to the respondent in June, 1935. He died intestate September 5, 1936, without issue. At the time of his death, the decedent was thirty-four years of age.

Since the early part of 1932, the son had been operating the El Rey apartments in Seattle, first as an employee of the appellant, and later as owner. In May, 1932, the appellant opened the joint account in question. The bank book was kept by the son at the apartments, although it would seem that the deposits were generally made by the appellant. While employed by the appellant, the son received sixty dollars a month. The net proceeds from the operation of the apartments were deposited in the joint account.

In May, 1934, the appellant left for a visit to Finland, his native country, and was absent about four months. Called as a witness by the respondent, he testified that, before leaving, he discussed with his son the purchase by the latter of the lease and furniture of the apartments. Terms were discussed, and the appellant named $3,700 as the purchase price, to be paid, without interest, out of the net earnings of the apartments. With the appurtenants there would go title to a deposit

of two hundred dollars held by the landlord as security for the rent. The son was reluctant, on account of ill health, to take on the responsibility, and no agreement was reached at the time.

The appellant testified that, on his return, the purchase was again discussed, and an agreement reached to have the son take the business over as of January 1, 1935. The agreement between the parties was not reduced to writing. The bank book shows that, on January 1st, there was on deposit in the joint account $1,803.20. The appellant did not withdraw this sum, and the son continued to make deposits in the account as before.

The respondent contends that the purchase was made in May, 1934, before the appellant's departure for Finland. The court made no specific finding as to the date of purchase, but the respondent's contention would seem the most probable. There is in evidence an account book in the handwriting of the son, in which entries are made of the operating expenses beginning with May 1, 1934, and the bank book shows that during the month of May the appellant withdrew practically all of the money then in the account to cover the expenses of his trip abroad. If the purchase was made in May, the balance of $1,800 in the account on January 1, 1935, was earned by the son. The date of the purchase is not material, because, while the appellant asserted in his testimony that the balance belonged to him, he allowed it to remain in the account and claims no allowance on account of it in this action.

December 3, 1935, when the bank account carried a balance of $2,751.57, the appellant, by arrangement with the son, withdrew $2,600 to apply on the purchase price. The respondent contends that the withdrawal of this amount completed payment of the purchase price. She testified that the appellant came to the

apartments to get the bank book for the purpose of making the withdrawal; that her husband, upon handing the book to the appellant, said, "That pays us up in full, doesn't it?" to which the appellant replied, "Well, Fred, that pays it up now, and we will go on down to the bank." The appellant denies making the quoted statement, or saying anything implying that the purchase price would be fully paid on withdrawal of the amount.

March 13, 1936, the appellant caused a new lease of the apartments to be executed by the owner of the building in the name of the son. Whether the new lease was made at the expiration of the term of the former lease, does not appear from the record.

In July, 1936, the son became ill and, accompanied by the respondent, went for treatment to Soap Lake, where he died September 5th. The son employed a woman to care for the apartments during his absence, and the bank book was left with the appellant to make any necessary deposits or withdrawals.

On the son's death, the appellant withdrew from the joint account the money required to pay burial expenses, including the purchase of a burial plot and the erection of a monument. The balance in the account stood at $776.48 on October 5, 1936. On or about this date, the respondent having returned to the apartments, the appellant, accompanied by a married daughter, called upon her there and produced a statement of his receipts and disbursements since the son's departure for Soap Lake, tendering to her an undeposited balance of $33.

The question of the amount due on the purchase price came up for discussion, and the appellant contended that there was still due him $1,100, the difference between the sum withdrawn in December, 1935, and the purchase price of $3,700. He offered to return

the $2,600 to the respondent and take the apartments over, or, if she desired, to let her pay the balance due on the purchase price in monthly installments. She contended that the full purchase price had been paid.

At this meeting, the respondent acquired possession of the bank book. She testified that the appellant gave it to her; the appellant testified that the respondent "grabbed" it out of his daughter's hands. However obtained, the book remained in her possession.

Shortly after this dispute, the appellant sent respondent a bill of sale to the furniture in the apartments. He testified that he did this to avoid having trouble with her. Subsequently, she secured letters of administration on her husband's estate and filed an inventory, listing among the assets of the estate a balance of $1,198.46, shown by the bank book to have been in the joint account on the date of her husband's death, not taking into account the withdrawals made by the appellant for burial expenses.

About April 1, 1937, some six months after his dispute with the respondent over the balance of the purchase price due, the appellant withdraw from the bank the balance of $776.48 in the joint account. The rules of the bank require a depositor to present his bank book when making withdrawal from a savings account. If the book is lost, an affidavit to that effect is required detailing the circumstances and search made by the depositor. The appellant admitted making an affidavit that he did not know where the book was, and excused himself by saying that he did not know where it was "on that day."

The evidence offered at the trial was conflicting. The trial court said that, in reaching the conclusion that the purchase price was fully paid, it took into account the more acceptable testimony of the respondent, coupled with other admitted facts.

The case is not free of difficulties. There is no direct evidence of the receipt by the appellant of any money other than the sum withdrawn from the joint account in December, 1935. The respondent testified that her husband had always told her he had a credit of a thousand or eleven hundred dollars on the purchase price; and there is also her testimony as to the conversation between the appellant and her husband at the time the $2,600 was paid, when the appellant said that the withdrawal would pay the purchase price in full.

The trial court gave greater credence to respondent's testimony than to that of the appellant's, and we cannot say that the evidence preponderates against its findings. But accepting the court's view that the debt was liquidated by the appellant's withdrawal of $2,600 from the account in December, 1935, we are of the opinion, nevertheless, that the judgment must be reversed.

■ The mutual savings bank act, chapter 123, Laws of 1929, p. 280, § 2 (Rem. Rev. Stat., § 3348 [P. C. § 373], subd. 3), provides:

"After any deposit shall be made by any person in the names of such depositor and another person and in form to be paid to either or the survivor of them, such deposit and any additions thereto made by either of such persons after the making thereof, shall become the property of such persons as joint tenants, and the same, together with all dividends thereon, shall be held for the exclusive use of such persons and may be paid to either during the lifetime of both or to the survivor after the death of one of them, and such payment and the receipt or acquittance of the one to whom such payment is made shall be a valid and sufficient release and discharge to such savings bank for all payments made on account of such deposit prior to the receipt by such savings bank of notice in writing not to pay such deposit in accordance with the terms thereof. The making of the deposit in such form shall,

in the absence of fraud or undue influence, *be conclusive evidence, in any action or proceeding to which either such savings bank or the surviving depositor is a party,* of the intention of both depositors to vest title to such deposit and the additions thereto in such survivor." (Italics ours.)

In *Winner v. Carroll,* 169 Wash. 208, 13 P. (2d) 450, where the ownership of joint accounts in two mutual savings banks was involved, the court, after an exhaustive examination, announced as its conclusion that, under the mutual savings bank act,

" . . . a deposit of the nature involved in this case presumptively creates an estate in joint tenancy with the attendant right of survivorship; that the presumption may be rebutted during the lifetime of both depositors, but that upon the death of either depositor the presumption, in the absence of fraud or undue influence, becomes conclusive in any action or proceeding to which the bank or the surviving depositor is a party."

In announcing its conclusion on the facts, the trial court referred to the obstacle which Rem. Rev. Stat., § 3348, seemed to interpose to the respondent's right to a recovery. The court expressed the opinion, however, that the money deposited in the joint account subsequent to the son's marriage became, in view of their joint efforts, community property of the spouses; and that, being such, it was beyond the power of the husband to so dispose of it by means of a joint account as to deprive the respondent of her community interest.

Assuming the correctness of the court's view as to the want of power in the husband to deposit community funds in a joint account, in the name of a person other than a member of the community, we are of the opinion that the profits from the operation of the apartments deposited in the joint account were separ-

ate property of the husband. Whether the purchase was made in May, 1934, or on January 1, 1935, it was before Fredrik Toivonen's marriage to respondent in June, 1935.

On June 1, 1935, the deposit in the joint account was $2,113.01. This amount remained in the account until the appellant's withdrawal of $2,600 in December. If, as the respondent contended, and the court found, the son was entitled to a credit of eleven hundred dollars, this credit must have accrued in the son's favor before his marriage; so that not only was the property purchased before marriage, but nearly all of the money going to pay for it was earned and deposited in the joint account by the husband before that time. There is no claim of any agreement between the spouses to change the husband's separate property into community property.

The rule applicable to the rights of the spouses is stated in *State ex rel. Van Moss v. Sailors,* 180 Wash. 269, 39 P. (2d) 397, as follows:

"It is undoubtedly true that husband and wife may, by proper agreement or conveyance, change their separate property into comunity property and their community property into separate property. *Gage v. Gage,* 78 Wash. 262, 138 Pac. 886; *Volz v. Zang,* 113 Wash. 378, 194 Pac. 409. But in determining whether separate property has, in fact, been changed from separate into community property, the following rules have been definitely settled by this court and are to be kept in mind: (1) The status of property, whether separate or community, is to be determined as of the date of its acquisition; (2) this rule is true with reference to personal property as well as with reference to real property; (3) if the property is once shown to have been separate property, the presumption is that it continues separate property until that presumption is overcome by evidence; (4) separate property continues to be separate property through all its changes and transitions, as long as it can be clearly traced and

identified; (5) the rents, issues and profits of separate property remain separate property." (Citations.)

Referring to the claim made in the cited case that one of the spouses had added to the property involved by way of community services, the court said:

"What Mr. Sailors has added to it in the way of services, considered as a community activity, has been compensated for by withdrawals for living expenses, which, likewise, were community obligations."

And so here, while the respondent and her husband rendered services in the conduct of the husband's separate business, these services were compensated by the payment of their living expenses out of the business.

Our conclusion is that the judgment must be reversed, and the cause remanded with direction to dismiss.

STEINERT, C. J., SIMPSON, BEALS, and MILLARD, JJ., concur.