[No. 25227. Department Two. December 31, 1934.]

THE STATE OF WASHINGTON, *on the Relation of Bert Van Moss, Respondent,* v. ROY L. SAILORS *et al., Appellants.*[1]

*L. A. Dwinell,* for appellants.

*Atwell & Moore,* for respondent.

STEINERT, J.—This is a garnishment proceeding brought to subject certain corporate stock to the satisfaction of a judgment previously entered upon a separate liability. The garnishee answered, alleging that the stock was community property. The answer was controverted. Upon a trial before the court, findings and conclusions were made, based upon which a sup-

[1]Reported in 39 P. (2d) 397.

plemental judgment was entered directing that the stock be sold and the proceeds thereof applied in satisfaction of the original judgment. The defendants and the garnishee have joined in this appeal.

The question to be determined here is whether the stock was separate property or community property.

The pertinent facts, as disclosed by the record, are these: Appellants Roy L. Sailors and Elizabeth A. Sailors were married in 1903 and lived in Cleveland, Ohio, until 1926, when they moved to Longview, Washington. Mr. Sailors had for many years been engaged in the paint and varnish business in Ohio. In 1922, he and his wife organized Sailors Paint & Varnish Company, an Ohio corporation, all of the stock therein except one or two shares being taken and held in their joint names. A few months prior to their coming to Washington, the Sailors sold all their interest in the Ohio corporation for forty-five hundred dollars, but retained the machinery, worth between nine thousand and ten thousand dollars. They also had cash from other sources amounting to about three thousand dollars. The machinery and cash, the total value and amount of which was about eighteen thousand dollars, they brought to Washington. It appears to be conceded by counsel, and was so stated by the trial court in its memorandum opinion, that all of the property brought to Washington was the separate property of Mr. and Mrs. Sailors, and was owned and held by them in common but undivided.

In July, 1926, shortly after coming to Washington, appellants and W. G. Wightman organized Longview Paint & Varnish Company, a corporation, the garnishee herein, with one thousand shares of non-par capital stock. The Sailors turned in the machinery and seventy-five hundred dollars in cash for 358 shares of the stock, which was issued to Mr. Sailors on

September 6, 1926. This stock was evidenced by four certificates, three for one hundred shares each and the fourth for fifty-eight shares. On December 21, 1927, the fourth certificate was cancelled and a new certificate was issued to Mrs. Sailors, in order to qualify her as an officer of the company.

Mr. Wightman originally took two hundred shares of the stock, for which he paid the company ninety-nine hundred and fifty dollars. In January, 1928, Mr. Wightman bought eighty shares more. In the same month, forty-four additional shares were issued to Mr. Sailors and a like amount to Mr. Wightman, in payment of salaries owing to them by the company. All told, then, 344 shares stood in Mr. Sailors' name, 58 in Mrs. Sailors' name and 324 in the name of Mr. Wightman. The remainder of the stock of the corporation was never issued.

In the meantime, that is, during 1926, the corporation bought a lot in Longview, for which it paid thirty-five hundred dollars, and constructed a building thereon at a cost of eight thousand dollars. A mortgage for five thousand dollars was placed on the lot and building. The company then began to operate as an active concern. Mr. Sailors was made president and general manager, and had charge of the company's affairs.

In the early part of 1929, the Sailors bought Mr. Wightman's stock for $12,750. The transaction was carried out in the following manner: Mr. Sailors gave the company his note for $12,750; the company then increased its mortgage on the property for an additional loan of three thousand dollars; at the same time the company borrowed three thousand dollars from a bank on a note signed by the company and endorsed by Mr. and Mrs. Sailors. The proceeds of the two loans were placed in the company's checking ac-

count, and Mr. Wightman was given a check for $6,750 and the same amount was charged to Mr. Sailors on the books of the company. Later, Mr. Wightman was paid the remaining six thousand dollars owing to him, by the company's check, which was also charged to Mr. Sailors. Mr. Wightman's stock was thereupon cancelled, and a new certificate for 324 shares was issued to Mr. Sailors on January 2, 1929. On December 31, 1931, the last named certificate was cancelled and none was ever issued in its place. So, Mr. and Mrs. Sailors' holdings remained as before, namely, 344 shares in his name and 58 shares in her name.

In the fall of 1929, Mr. Sailors bought a controlling interest in a small paint business in Tacoma, in order to secure an outlet for the Longview company's products. For that venture, Mr. Sailors drew fifteen hundred dollars from the company's funds, charging the amount against himself. The stock thus purchased in the Tacoma plant was issued to Mr. Sailors. In 1932, he sold the stock, turned the proceeds of the sale over to the Longview company, and cancelled the fifteen-hundred-dollar charge against himself.

It further appears that Mr. Sailors was the inventor and patentee of a floor wax which the company manufactured. All of the processes in connection therewith, he turned over to the company without any charge therefor.

The Sailors had no personal checking account, but paid all living expenses with checks drawn on the company. The business seems to have been conducted largely as a family affair. Two of their sons worked in the plant for a number of years, but were paid less than what would ordinarily have to be paid for the services rendered by them.

The business of the company has, unfortunately, not been a financial success. The original machinery put into the plant is now worth not to exceed one thousand dollars. There is a mortgage against the property in the sum of eight thousand dollars, and unpaid taxes and assessments amount to about one thousand dollars. There are outstanding accounts of approximately thirty-five hundred dollars, and there is also the note to the bank, on which there is now owing thirty-six hundred dollars. The assets of the company do not exceed its liabilities, and it is now practically insolvent.

In January, 1932, the relator herein obtained a judgment against Mr. Sailors in the sum of $1,011.30. That judgment was not a judgment against the community, but only against Mr. Sailors, individually. A writ of garnishment directed to the company was issued on the judgment. The issue in this case was whether the stock held by Mr. and Mrs. Sailors was community property or separate property. The court held that the 44 shares issued in payment of Mr. Sailor's salary was community property, but that the remainder of the stock, namely, 358 shares, was separate property, belonging one-half to Mr. Sailors and the other half to Mrs. Sailors. In our later discussion, we shall refer to certain other portions of the evidence, relied on by appellants.

Appellants contend that, although the property brought by them to the state of Washington was originally separate property, it thereafter became community property (1) by arrangement and intention of the parties, and (2) by operation of law.

It is first contended by appellants that the property was given a community status by the act and intention of the parties. The basis of their contention is that, when the Longview company was being formed,

an attorney advised Mr. and Mrs. Sailors as to the effect of the community property law of Washington; that Mr. Sailors then wanted his wife's interest in the property fully protected, and was told that, if it was community property, it would make no difference whether the stock was put in his name or in her name; that the fifty-eight shares were ultimately issued to Mrs. Sailors, not as indicating her entire interest in the property, but simply to qualify her as an officer of the company. At this point, it will be observed that the fifty-eight shares were not issued to Mrs. Sailors at the time that the company was organized, but over a year later.

It is undoubtedly true that husband and wife may, by proper agreement or conveyance, change their separate property into community property and their community property into separate property. *Gage v. Gage*, 78 Wash. 262, 138 Pac. 886; *Volz v. Zang*, 113 Wash. 378, 194 Pac. 409. But in determining whether separate property has, in fact, been changed from separate into community property, the following rules have been definitely settled by this court and are to be kept in mind: (1) The status of property, whether separate or community, is to be determined as of the date of its acquisition; (2) this rule is true with reference to personal property as well as with reference to real property; (3) if the property is once shown to have been separate property, the presumption is that it continues separate property until that presumption is overcome by evidence; (4) separate property continues to be separate property through all its changes and transitions, as long as it can be clearly traced and identified; (5) the rents, issues and profits of separate property remain separate property. *In re Brown's Estate*, 124 Wash. 273, 214 Pac. 10; *Rogers v. Joughin*, 152 Wash. 448, 277 Pac. 988.

In *Guye v. Guye,* 63 Wash. 340, 115 Pac. 731, 37 L. R. A. (N. S.) 186, it was said:

"Moreover, the right of the spouses in their separate property is as sacred as is the right in their community property, and when it is once made to appear that property was once of a separate character, it will be presumed that it maintains that character *until some direct and positive evidence to the contrary is made to appear.*" (Italics ours.)

It is conceded, in this case, that the property was separate property when it reached the state of Washington. Mr. Sailors' idea of the community property law is not very clear from the evidence, but for that he is not to be criticized. Doubts and uncertainties upon the subject are not limited wholly to laymen. It has afforded a prolific field of discussion and dispute among lawyers, and even among courts. Mr. Sailors' main idea was to protect the interests of his wife in the property. She was to preserve a one-half interest, whether as separate or as community property. The advice of the attorney was, of course, based upon the assumption that the property *was* community property, but, as we have already stated, it was not community property at that time. Under the trial court's decision, Mrs. Sailors' interest was fully protected, for it was declared that one-half of the stock was her separate property.

We have very carefully read the record and fail to find any evidence, much less any *positive and direct evidence,* of any agreement between Mr. and Mrs. Sailors that the property was to be converted from its separate character into that of community property. Mr. Sailors did not testify as to any agreement, and Mrs. Sailors, though in court, did not testify at all. Appellants' first contention must, therefore, fail.

The second contention is that the change of status was effected by a commingling of the separate

property with the community property subsequently acquired, thus destroying the identity of the property as separate property. We have already referred to the rule, among others, that separate property continues to be separate property through all its changes and transitions, as long as it can be clearly traced and identified.

If we consider the transfer simply as being a conversion of machinery and money into capital stock, then, of course, it has been clearly traced and is easily identified. If, on the other hand, we consider the stock merely as evidence of ownership of the paint and varnish business, including all of its assets, then, although the tracing and identification are not quite so immediate and direct, they are, nevertheless, under the facts before us, still definite and positive. The property furnished by the Sailors ultimately went into the lot, the building, the machinery and equipment and supplies. What is left of the business, so far as the record shows, is of the same kind and character today. Moreover, what there is of it, they own. It is as capable of identification and division as was the property that went into it. What Mr. Sailors has added to it in the way of services, considered as a community activity, has been compensated for by withdrawals for living expenses, which, likewise, were community obligations.

A number of our cases have dealt with situations where the question of commingling was involved and discussed. Among them are the following: *Doyle v. Langdon,* 80 Wash. 175, 141 Pac. 352; *In re Buchanan's Estate,* 89 Wash. 172, 154 Pac. 129; *In re Finn's Estate,* 106 Wash. 137, 179 Pac. 103; *Jacobs v. Hoitt,* 119 Wash. 283, 205 Pac. 414; *In re Brown's Estate,* 124 Wash. 273, 214 Pac. 10; *In re Carmack's Estate,* 133 Wash. 374, 233 Pac. 942; *Zintheo v. Goodrich*

*Rubber Co.,* 136 Wash. 196, 239 Pac. 391; *Rawleigh Co. v. McLeod,* 151 Wash. 221, 275 Pac. 700; *In re Gulstine's Estate,* 166 Wash. 325, 6 P. (2d) 628; *In re Hebert's Estate,* 169 Wash. 402, 14 P. (2d) 6.

A reading of these cases will disclose variant states of fact and, consequently, varying conclusions. It would be of no aid to analyze them. They well illustrate the effect of distinguishing features of fact, and indicate that each case must depend for its result upon the particular situation presented. In each case, there must be taken into consideration the sources from which the property came, the intention of the parties, the acts expressive of their intention, the extent, effect and result of the commingling and the ease or difficulty of tracing, identifying and segregating the property, and, no doubt, other elements under peculiar circumstances.

Confining ourselves to the facts in this case, we are convinced that there was no such commingling as destroyed the separate character of the property. The judgment is affirmed.

BEALS, C. J., MITCHELL, HOLCOMB, and BLAKE, JJ., concur.