## GREENWOOD v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10217.

Circuit Court of Appeals, Ninth Circuit.

April 6, 1943.

John M. Schwartz, of Los Angeles, Cal., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., Tax Division, and Sewall Key, Helen R. Carloss, Muriel Paul, and Arthur A. Armstrong, Sp. Assts. to Atty. Gen., for respondent.

Before GARRECHT, MATHEWS, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

There is presented here a petition for review of a decision of the United States Board of Tax Appeals,[1] wherein it was decided that a deficiency existed in the federal estate tax returned by petitioner, Kenneth R. Greenwood, as administrator with-the-will-annexed of the estate of Charles H. Greenwood, deceased.

Petitioner, who is also the son of decedent, reported the property involved in this case as being community-owned, explaining that in the administration of the estate he was endeavoring to carry out the "ideas" of his father, who had always stated that he believed that one half of the property was his and one half belonged to his wife. The tax returned was based upon one half of the total net value of the property. The Commissioner gave notice of a deficiency, maintaining that the total value of the property was includible in the gross estate of decedent, on the ground that the property either was owned by the spouses as joint tenants or remained the separate property of the husband.

Upon consideration of a petition for a redetermination of the deficiency declared by the Commissioner, the Board, in ruling against the petitioner, determined that the property had been held in joint tenancy by decedent and his wife, and because the wife had given no consideration for her interest therein, that therefore the total value of the property must be included in the gross estate of decedent, as provided for by Section 811 of the Internal Revenue

---

[1] Now called the Tax Court of the United States, 26 U.S.C.A. Int.Rev.Code, § 1100.

Code (53 Stat. 120), 26 U.S.C.A. Int.Rev. Code, § 811, the pertinent parts of which appear in the margin.[2]

Petitioner does not dispute that the total value of the property was includible in decedent's gross estate if at the time of his death the property was held in joint tenancy or was separately owned by him. The sole issue presented here is whether all of the property in which the decedent had an interest at the time of death may properly be taxed in its entirety as belonging to his estate or whether he and his wife had transmuted his separate property into community property, thus giving to the wife such an interest therein that when he died, only one half of its value could be properly taken as the measure in computing the tax on his estate.

The evidence taken at the hearing before the Board is not before us; instead there is only the statement of the Board's findings of fact. Petitioner assigns as error the fact that the Board did not "conclude upon its findings of fact that the property involved was community property, because the findings show that the decedent and his wife understood that they owned equal interests therein, and they always referred to the property as community property and so treated it for all purposes".

Following is a statement of the case, which is rather detailed, owing to the nature of the controversy:

It is agreed that all property involved in the instant case was originally the separate property of decedent, and that if at any time the wife acquired an interest therein, she did so without having furnished any consideration. The property is personalty, consisting principally of securities and cash, and was acquired almost entirely through an inheritance received in 1927 by decedent from his mother and through decedent's earnings, accumulated while he was domiciled in New York. At the time of marriage neither he nor his wife had any property. In 1937 the wife received an inheritance of about $1000, which she retained on deposit in her own name. In 1927 decedent removed from New York to Arizona, and at that time he retired from all business activities, and thereafter neither he nor his wife engaged in remunerative occupation. He and his family continued to live in Arizona until his death in 1939.

In 1928 decedent and his wife rented a safe deposit box at an Arizona bank under a rental agreement signed by both parties which contained the following declaration: "We, the undersigned, joint renters * * *, hereby declare and represent that we own as joint tenants, with the right of survivorship, all the property of every kind or character now within said box and that all property which may be deposited therein by either or any of us shall be and is owned by us as such joint tenants."

There was the further recitation that each was to have access to the box without notice to the other; that the bank was authorized to surrender the contents of the box to either or to the survivor; and that each had "read, received a copy and approve[d] of the Bank's rules governing safe deposit boxes", said rules referring to the right of survivorship. Also, decedent established in the same year two accounts with a bank in Tucson, Arizona, both he and his wife signing the signature cards and it being provided that either could draw on the accounts. One, a checking account, was made to the credit of "Greenwood, C. H., or Albertine, Either or Survivor of Either",

---

[2] "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

"(a) Decedent's interest. To the extent of the interest therein of the decedent at the time of his death;

\* \* \* \* \* \* \*

"(e) Joint interests. To the extent of the interest therein held as joint tenants by the decedent and any other person, * * * or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth: Provided, That where such property or any part thereof, or part of the consideration with which such property was acquired, is shown to have been at any time acquired by such other person from the decedent for less than an adequate and full consideration in money or money's worth, there shall be excepted only such part of the value of such property as is proportionate to the consideration furnished by such other person: * * *."

and the other, a savings account, was credited to "Greenwood, C. H., or Albertine".

At the time of decedent's death there were contained in the safe deposit box stocks and bonds representing a large sum of money; in addition, approximately $8000 were on deposit in the two accounts in the Tucson bank, and nearly $19,000 were in various savings accounts in decedent's name alone, said accounts being with banks located in Massachusetts, California, and Arizona. The findings show that all of the assets, including securities, documents of title, and certificates, held in decedent's name at the time of his death were in the safe deposit box; and although there was no specific finding on the point, the box apparently contained the certificates evidencing the deposits in the banks. The Board proceeded on this assumption, and no objection having been voiced, we shall do likewise.

Aside from the safe deposit box and the two bank accounts in Tucson (and certain real estate in Arizona, which was in the name of both, but not here involved), all other forms of property were carried in the name of decedent. Although the wife had a key to the safe deposit box, she never went to it and never saw the contents thereof. She had seen some of the stocks and bonds, all of which were in the name of the husband. He managed the property, and never asked his wife for her opinion, permission, or advice about making sales or exchanges. He received the income from all sources and disposed of it as he saw fit. She never received or requested an accounting from him. He provided her with a monthly allowance for household expenses, making these payments to her himself. In his absence she drew checks on the checking account in the usual amount, and on a few occasions issued other checks. The following is quoted from the Board's statement of findings which, as hereinbefore noticed, is uncontroverted: "In a general way the husband and wife discussed their property relations. He consulted her when real estate was bought, but there was no specific occasion upon which property was discussed. He always spoke of his property as being half hers and always referred to the fact that half of everything he had was hers. He used the expression community property, and always referred to the property as community property. It was her understanding that half of the ownership of the bank accounts was hers, that understanding being based upon different things that he told her. * * * About a year before he died, the husband told the wife she was worth one-half of what he was worth, but she never had any written communication or document on the subject. Neither husband nor wife signed any written statement. * * * Once when the husband and wife had a disagreement, about a year before he died, he made the remark, 'Well, half of everything I have is yours.' He made that statement several times. He prepared the income tax returns for both, but she signed her own and he signed his. Her income as returned was slightly less than his. The conversations about community property and her interest were only occasional and the subject was not referred to often. The decedent stated to an intimate friend while automobile riding in 1936 that one-half of all of his property belonged to his wife, that they had split everything they had fifty-fifty. On another occasion in 1938, in the course of a family argument the wife said to her husband in the presence of the friend: 'You know, Charles, that one-half of all we own belongs to me', and the husband stated: 'That is correct, I know it as well as you do.' In 1938 the decedent stated to the same friend that his wife was ill and that he wanted a will prepared so that if she passed away her community interest would not pass to the son, which would be embarrassing to him, and that he would like to have a will so that she could give her half to him, the decedent. At the date of decedent's death, his wife's will provided that all of her property go to him; and his will left all of his property, except a certain trust estate not here involved, to his wife."

In determining the gross estate of a decedent for the purpose of computing the federal estate tax we must look to state law (Lang v. Commissioner, 1938, 304 U. S. 264, 58 S.Ct. 880, 82 L.Ed. 1331, 118 A. L.R. 319; United States v. Goodyear, 9 Cir., 1938, 99 F.2d 523), and in this instance there being only personalty involved, it is with the law of Arizona, the state of decedent's domicile, that we are concerned. Under that law the wife has a present, existing, and equal interest with the husband in the community estate (La Tourette v. La Tourette, 1914, 15 Ariz. 200, 208, 137 P. 426, Ann.Cas.1915B, 70; Schwartz v. Schwartz, 1938, 52 Ariz. 105, 79 P.2d 501, 116 A.L.R. 633), and therefore if, as contended by petitioner, the property was community-owned at the time of decedent's

death, only one half could be properly considered in establishing the value of his gross estate for federal estate tax purposes. Lang v. Commissioner, supra, 304 U.S. 264, 58 S.Ct. 880, 82 L.Ed. 1331, 118 A.L.R. 319; United States v. Goodyear, supra, 99 F.2d 523.

"Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid" (Helvering v. Taylor, 1935, 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623), which burden is sustained by a clear showing that the determination was arbitrary or erroneous. Forbes v. Hassett, 1 Cir., 1942, 124 F.2d 925, 928. Petitioner does not contend that the Commissioner acted arbitrarily; rather, that he acted erroneously.

In his brief petitioner argues: "Under the law of the state of Arizona, where either husband or wife has separate property and it is their intention to treat such property as the community property of both it becomes community property in accordance with their intent; and in so far as personal property is concerned it is not necessary that such transmutation be expressed formally, either verbally or in writing, as long as it can be fairly inferred from the circumstances that a community interest was intended."

The state of Arizona has adopted a very liberal rule as regards the right of husband and wife to deal with each other concerning their respective interests in property (Luhrs v. Hancock, 1899, 6 Ariz. 340, 57 P. 605; Rundle v. Winters, 1931, 38 Ariz. 239, 298 P. 929; In re Estate of Baldwin, 1937, 50 Ariz. 265, 273, 274, 71 P. 2d 791; Schwartz v. Schwartz, 1938, 52 Ariz. 105, 109, 79 P.2d 501, 116 A.L.R. 633), and although in some of the "community-property" states (particularly, Texas and New Mexico) the right of a husband and wife to transmute separate property into community by a gift of such property is expressly denied (see annotation, 120 A.L.R. 264 ff.), the case of Rundle v. Winters, supra, 38 Ariz. at page 245, 298 P. at page 931, indicates that in Arizona such a transmutation may be effected. There it is said: "When spouses have treated the income from their separate property as community, and it was their intent that it should become community, the character of the income changes in accordance with their intention."

Petitioner refers to the language just quoted from the Rundle case and states that it "can leave no doubt that husband and wife can change separate personalty to community by mere intention to do so". It is apparent at once that this statement is not wholly accurate—that in addition to intention that the property become community it must have been "treated" as such before a transmutation is effected.

Since there are very few Arizona decisions bearing upon the question now before us and because the supreme court of that state has frequently cited with approval the opinions of the Washington and California courts concerning the law of community property, petitioner has cited a number of decisions from those jurisdictions, which he urges us to follow.

The Arizona supreme court has said that the Arizona statutes dealing with community property are more nearly analogous to those of Washington than to those of any other state. Cosper v. Valley Bank, 1925, 28 Ariz. 373, 379, 237 P. 175. In the state of Washington property owned by the spouses separately or jointly may be changed into community by a "proper agreement or conveyance" between them (State ex rel. Van Moss v. Sailors, 1934, 180 Wash. 269, 274, 39 P.2d 397, 399; Volz v. Zang, 1920, 113 Wash. 378, 383, 194 P. 409) but such conversion cannot be effected "by the oral agreement of the spouses alone" (Rogers v. Joughin, 1929, 152 Wash. 448, 456, 277 P. 988, 991) the agreement must be established by "positive and direct evidence". State ex rel. Van Moss v. Sailors, supra, 180 Wash. at page 275, 39 P.2d at page 399.

In California it has been consistently held that the separate property of either or both spouses (including property held by them in cotenancy) may be transmuted into community property without the necessity of any written agreement provided the agreement or understanding to that effect is fully consummated at the time the question arises as to whether or not the conversion has taken place. Kenney v. Kenney, 1934, 220 Cal. 134, 136, 30 P.2d 398, and cases there cited; Schipper v. Penkalski, 1941, 46 Cal. App.2d 28, 32, 115 P.2d 231. The parties need not formally agree in precise words that the property should be community property; if it has been treated as such and it clearly appears from all the circumstances that their understanding and intention was

that it should be such, a transmutation will be held to have been consummated. In re Estate of Sill, 1932, 121 Cal.App. 202, 9 P.2d 243.

In this case the following facts support the Board's decision sustaining the Commissioner's determination: (1) the rental agreement signed by both parties when they rented the safe deposit box in 1928, wherein they expressly stated that they were holding the contents as joint tenants with right of survivorship; (2) the signature cards signed by each of them when the two accounts with the Tucson bank were established, one card providing that the account represented thereby was payable to "Either or Survivor", and the other, that the account was payable to either. These written agreements were never revoked nor modified throughout more than ten years prior to the death of decedent. Perfectly in accord with the theory that the property was held in joint tenancy, and in fact lending support thereto, is the understanding of decedent and his wife that each had a one-half interest in the property. Also consistent with that theory is the conversation between the parties during a family argument in 1938 when the wife said, "You know, Charles, that one-half of all we own belongs to me", and the husband replied, "That is correct, and I know it as well as you do"—which was the only instance, as shown by the findings, in which any agreement between husband and wife expressly appears. On the other hand, nowhere in the findings are there any facts directly showing a mutual understanding and intention of the husband and wife to convert the property into that of the marital community. There is the fact that the husband always referred to the property as "half hers" and as "community property"; such statements, however, fall within the rule enunciated in Bias v. Reed, 1914, 169 Cal. 33, 42, 145 P.

516, 519, that the "character of the ownership of property, whether separate or community, is to be determined by the proof showing the mode of acquisition, rather than by any declaration of one of the parties that the property was or was not community property".[3] Moreover, those loose, oral expressions of the husband may well have been the result of a misunderstanding as to the law of community property. The legal principles governing the community property system are technical in nature, and the unfamiliar mind of the layman might understandably conceive that any form of equal ownership of property by a husband and wife residing within a community-property jurisdiction constitutes community ownership. Particularly might there be confusion in a case such as the one before us, for here until he retired and moved to Arizona, the husband, together with his family, had been living in New York, a "common-law" state. This explanation also offers a solution as to why the decedent and his wife executed mutual wills.

Petitioner argues that "The facts that the decedent turned over to his wife a monthly allowance for household expenses; that he received the income and handled it without control by the wife; that he gave her no accounting; and that he prepared both income tax returns are all consistent with the community property theory and contrary to a joint tenancy theory concluded by the Board." This argument is without merit. In view of the fact that there was present here the intimate and closely knit relationship of husband and wife and of the fact that the husband was a man of wide business experience familiar with the handling of investments in securities, whereas the wife's occupation was home management, it is clear that there was no inconsistency between the existence of an estate in joint tenancy and the method employed in managing the property.

---

[3] That case was an action between the administrators of the estates of a deceased husband and wife to secure possession of land deeded by the husband to the wife many years before the death of either of them. In his opening statement the attorney for the husband's administrator offered to prove declarations of the wife that all of the property belonging to her and her husband was community property; but it was held that, nothing more cogent to prove the transmutation of the property into community property being offered by counsel, the trial judge did not err in directing a verdict in favor of the administrator of the wife's estate, on the ground that the property remained the separate property of the wife. The court said (169 Cal. at page 43, 145 P. at page 519): "It having been clearly shown that the property had been acquired by her [the wife] as her separate estate, her mere declaration that it was community would not, we are satisfied, be enough to sustain a finding that she had conveyed to her husband or had agreed with him that it should belong to the community."

■ The rental agreement for the safe deposit box and the signature cards for the bank accounts, in addition to establishing contractual relations with the bank, represent contracts between the decedent and his wife. In the absence of clear and convincing evidence that the parties had a contrary intent those instruments must be permitted to speak for themselves, especially in a case where a public official has relied upon them in acting to determine and protect the revenue interests of the Government.

■ Petitioner argues that under the laws of Arizona it is doubtful if a joint tenancy can exist in personalty and, further, if such a tenancy can be created by a transfer from one owner to himself and another. There is no Arizona decision passing directly upon either one of these points.

Section 986, Revised Code of Arizona, 1928, provides: "Where two or more persons hold property jointly and one joint owner dies before severance, and the grant or devise does not expressly vest the estate in the survivor, the interest in the estate of the owner dying shall not survive to the remaining joint owners but shall descend to the heirs of the deceased joint owner as though his interest had been severed and ascertained."

Here the written rental agreement for the safe deposit box, as well as one of the signature cards for the bank accounts, expressly provided that there was to be joint ownership with right of survivorship. But petitioner objects that the words of the statute "grant or devise" authorize only joint tenancies in real property. Paragraph 1102, Revised Statutes of 1913 (Civ. Code) prohibited joint tenancies as respects all types of property. That statute was revised in 1928, becoming Section 986, supra, which contains no reference to personalty.

"While it appears that joint tenancies were originally confined to interests in real property, it became settled at an early date that a tenancy of such character can exist in" personalty (14 Am.Jur. 81, 82, § 10; see, also, 33 C.J. 906, § 8), and the general rule is that unless a state statute specifically prohibits establishment of joint tenancies, they will be recognized. 33 C.J. 901, § 3. In Re Estate of Sullivan, 1931, 38 Ariz. 387, 393, 300 P. 193, 195, the Arizona supreme court said: "We should therefore presume that when a word, a phrase, or a paragraph from the 1913 Code is omitted from the Code of 1928, the intent is rather to simplify the language without changing the meaning, than to make a material alteration in the substance of the law itself." Under this interpretation it seems fair to reason that Section 986 of the 1928 Code did not abolish joint tenancies in personal property merely by use of the words "grant or devise", but that it abolished the right of suvivorship in either personal or real property unless the estate were expressly vested in the survivor by terms of the instrument creating the tenancy.

■ "There is a difference of opinion as to whether a joint tenancy can be created by a grant by the owner of property to himself and another. One view is that unity of title and unity of time are lacking in the estate created in the two grantees and therefore a tenancy in common results" (14 Am.Jur. 83, § 11) ; but, as we stated in the case of Edmonds v. Commissioner, 9 Cir., 1937, 90 F.2d 14, 16, certiorari denied 302 U.S. 713, 58 S.Ct. 32, 82 L.Ed. 551, "the weight of authority is opposed to that view. [Cases cited.] We believe the technical view should give way to the intention of the parties, and hold that a joint tenancy may be created by conveyance from one to himself and another, as joint tenants." That case involved property governed by the law of California, and as is the situation here, there were no state decisions directly in point. Because decedent and his wife clearly expressed their intention to create a joint tenancy with right of survivorship and because in Arizona a married couple may freely contract with each other, we hold that in this instance the property was held in joint tenancy.[4]

---

[4] Lending support to this conclusion is the case of In re Estate of Baldwin, supra, 50 Ariz. 265, 71 P.2d 791, which involved the question of whether a conveyance to husband and wife as joint tenants with right of survivorship took effect in accordance with its terms or whether the property became a part of the community estate. The court said (50 Ariz. at page 274, 71 P.2d at page 795) that "If the spouses may contract with each other concerning the interest of either in the community, there can be no reason why they may not agree between themselves that it may be conveyed to them in the first instance and held in joint tenancy."

922

Petitioner has failed to overcome the presumption of validity attaching to the determination of the Commissioner, and therefore the decision of the Board of Tax Appeals is

Affirmed.