Estate of Matthew J. Nasdeo, Deceased, Albert R. Nasdeo, Executor v. Commissioner.
Estate of Nasdeo v. Commissioner
Docket No. 256-66.
United States Tax Court
T.C. Memo 1968-60; 1968 Tax Ct. Memo LEXIS 235; 27 T.C.M. (CCH) 325; T.C.M. (RIA) 68060; April 15, 1968. Filed *235 Respondent's determination that the entire $33,020 of cash discovered in decedent's safety deposit box at the time of his death was taxable income to decedent in the year before his death, when decedent last entered the box, was arbitrary and unreasonable. Respondent's determination disapproved. Benjamin Weiner, 75 Paterson St., New Brunswick, N.J., for the petitioner. Leo A. Burgoyne, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: The respondent *236 determined deficiencies in petitioner's income tax as well as additions to tax under sections 6651(a), 6653(a), and 6654 of the Internal Revenue Code of 1954, [1] for the years 1959 and 1960, as follows: Additions to tax
Sec.
Sec.
Sec.
Year
Deficiency
6651(a)
6653(a)
6654
1959
$17,558.65
$4,389.66
$877.93
$463.11
1960
410.00
102.50
20.50
11.49
Since respondent conceded at trial that petitioner is entitled to an additional exemption under section 151(c)(1) of the Code for both years, and petitioner did not allege error with respect to other adjustments made by respondent, the sole issue remaining for our determination is whether the $33,020 discovered in the decedent's safe deposit box after his death and reported in his estate tax return constitutes taxable income in 1959, the year before he died and the year he last visted the box. Findings of Fact Some of the facts have been stipulated and are found accordingly. Decedent, Matthew J. Nasdeo (hereinafter referred to as Matthew) died, at the age of *237 72, on March 16, 1960, having not yet filed a Federal individual income tax return for the calendar year ending December 31, 1959. One of Matthew's sons, Albert R. Nasdeo (hereinafter referred to as Albert) was duly appointed executor of Matthew's estate. No Federal individual income tax returns were filed by Albert as executor of his father's estate for the calendar year ending December 31, 1959, or for the taxable period ending March 16, 1960. On the date of his death, Matthew was survived by his wife, Emma Nasdeo (hereinafter referred to as Emma), and six 326 children. The names and ages of Matthew's and Emma's children at the date of Matthew's death are as follows: Age at
Child
Matthew's death
Charlotte Gursky
44
Margaret Woodard
37
Dorothy Marsicano
31
Florence Bacorn
27
Albert R. Nasdeo
34
Robert L. Nasdeo
33
Two sons born prior to the date of Albert's birth predeceased Matthew. One of these died as an infant. The other, Matthew Nasdeo, Jr., died in 1939. Emma and Matthew were married in 1911. They lived in Brooklyn, N. Y., until 1918, when they moved to 530 Metler's Lane, Pascataway, N.J., where they were living on the date of Matthew's *238 death. Matthew was employed in various jobs all of his adult life. He was employed as a business agent for the International Hod Carriers and Common Laborers' Union of America, Local No. 156, from shortly before World War II until Albert replaced him in this position in June of 1959, when his health became bad. In 1941 Matthew was paid $12 per week by the local union and collected $1 per week from each member of the local that was employed for a certain length of time. The local union membership varied from approximately 60-70 men before the war up to 375-400 after the war. Matthew's only other known business interest was the trucking business, which he originally entered with his son Matthew Nasdeo, Jr., in the late 1930's. After the latter died, Matthew kept the trucks operating, and by mid-1947 had been joined by his sons, Albert and Robert. In this family enterprise Albert and Robert primarily drove the trucks, while Matthew generally continued to make arrangements with the customers and keep the books. The business was eventually incorporated as A. R. Nasdeo, Inc., with Albert and Robert receiving equal and controlling amounts of the stock. Matthew, who put up most of the *239 money, received only a qualifying share. The business was liquidated in 1954 or 1955 after Albert had a dispute with Robert's wife. As of the date of trial, the vehicles remained in the front yard of the family home in Pascataway, N.J., where Albert also resided. Of the cash that was in the business when it was liquidated, most of it was used to repay Matthew, although some was used for home repairs and other purposes. There is no indication in the record, however, of how much Matthew received in this manner. A subsequent flood in the family home's basement destroyed any remaining records pertaining to the trucking business. On October 25, 1946, Matthew opened a safe deposit box in his own name at the National Bank of New Jersey in New Brunswick, N.J. On December 23, 1946, the safe deposit box was transferred to the names of Matthew and Margaret Nasdeo and on October 3, 1951, further transferred to Matthew and Robert L. Nasdeo (hereinafter referred to as Robert). There is no indication in the record of when, if ever, anyone other than Matthew visited the safe deposit box. However, the visitations to the safe deposit box by Matthew were as follows: Nov. 22, 1946
Dec. 14, 1951
Dec. 13, 1946
Jan. 18, 1952
Dec. 23, 1946
Jan. 30, 1957
Dec. 1, 1947
Feb. 14, 1957
Oct. 22, 1948
Aug. 14, 1958
Apr. 19, 1951
Aug. 15, 1958
Nov. 14, 1951
Sept. 7, 1959
*240 On September 7, 1959, Matthew's last visit to the safe deposit box, and his only visit in 1959, his health was in such poor condition that it was necessary for Albert to drive him to the bank. Matthew carried nothing in his hands as he walked into the bank. In 1959, Matthew was hospitalized in New Brunswick, N.J., as well as in Florida, where he and Emma were driven by one of their sons. He had suffered a heart attack some years earlier. Matthew was so weak that he was only able to work part-time and he was unable to do any driving, which function was taken over by Albert. Although Albert served as Matthew's driver, Matthew continued in his position as business agent until June 1959 when Albert was elected to this position. Throughout his life Matthew was able to take care of all his debts and was able to take trips to Florida with Emma after their children were grown. In 1953 or 1954 Matthew, with his own money, built two more homes, which cost a total of about $9,100, for other members of the family on ground adjoining the family home. Albert filed an estate tax return (Form 706) on behalf of Matthew. The estate tax return listed the following assets in Matthew's gross estate: *241 327 Type of Asset
Amount
Real estate
$ 12,500.00
Real estate
12,500.00
Government bonds
3,366.67
Bank savings accounts
33,749.15
Bank checking accounts
711.75
Bungalow, Hollywood, Florida
3,500.00
Cash - Safe deposit box
33,020.00
Mortgages
3,225.00
Automobile
500.00
Accrued interest
17.40
Total Gross Estate
$103,089.97
The audit by internal revenue agent Charles B. Lazarus (hereinafter referred to as Lazarus) of Matthew's income tax liabilities for the years 1959 and 1960 arose as the result of the disclosure in the estate tax examination of the amount of $33,020 in cash discovered in Matthew's safe deposit box. There is no indication in the record of the denominations and series of the cash that was found there, nor, is there any indication of any other items found in the box. Lazarus, in the course of his audit, did not attempt to determine from any member of Matthew's family, including Albert as Matthew's executor, the source or date of acquisition of the $33,020. Nor did he inquire, from Matthew's family, whether or not Matthew placed the $33,020 in the safe deposit box on September 7, 1959, the date of Matthew's only visit to the *242 box in the year the respondent determined that said amount is taxable income. He did not, in fact, have any contact with any member of Matthew's family. Rather, it was his practice to deal solely with the taxpayer's representative. Lazarus, in this regard, telephoned a man named Blacher, who had prepared the estate tax return (Form 706) as attorney for the estate. Lazarus did not discuss the $33,020 with Blacher; Blacher, however, referred Lazarus to Benjamin Weiner (hereinafter referred to as Weiner), who has appeared herein on behalf of the petitioner. Weiner did not suggest to Lazarus that he contact any members of Matthew's family. Nor did he suggest any source of the $33,020 other than an indication that it was from funds that had been previously taxed. Lacking any knowledge as to the source of the $33,020, Lazarus prepared a source and application of funds statement for the years 1947 through 1958 to determine if funds could have been acquired over these years which would make up the $33,020. He started with the year 1947 because it was the year after the safe deposit box was opened. The following is a reproduction of that statement: 328 ESTATE OF MATTHEW J. NASDEO, DECEASED
Source and Application of Funds
Sources
1946
1947
1948
Wages Gross
$2,600
$3,900
Expense Reimb
1,300
1,300
Gross Rents
Mtge. Rec. Barbara-Est. Prin.
Mtge. Rec. Barbara-Int. Est.
Total Sources
3,900
5,200
Application
Payroll Deductions Est.
$ 300
$ 600
Car Exp. (?) - Entertainment, etc.
1,300
1,300
Rental Expense
Add Tax - 1955
Add Tax - 1956
Increase in Bank Bal.
1955 Cadilac
Barbara Mtge.
Brick House Purchased
Frame House Purchased
Balance of Tax
*** Cash Cost of Living - Est.
3,000
3,000
Total funds applied
$4,600
$4,900
Cash on Hand (Shortage)
($ 700)
or Overage
$ 300
Net Shortage - 1947 to 1953, inclusive
Add to 1954 shortage
1955 to 1957 overage applied to 1958
shortage
* Shortage
Overage
Cash on hand estimated at 1/1/59
*243 ESTATE OF MATTHEW J. NASDEO, DECEASED Source and Application of Funds
Sources
1949
1950
1951
Wages Gross
$3,900
$3,900
$3,900
Expense Reimb
2,600
2,600
2,600
Gross Rents
Mtge. Rec. Barbara-Est. Prin.
Mtge. Rec. Barbara-Int. Est.
Total Sources
6,500
6,500
6,500
Application
Payroll Deductions Est.
$ 600
$ 600
$ 600
Car Exp. (?) - Entertainment, etc.
2,600
2,600
2,600
Rental Expense
Add Tax - 1955
Add Tax - 1956
Increase in Bank Bal.
1955 Cadilac
Barbara Mtge.
Brick House Purchased
Frame House Purchased
Balance of Tax
*** Cash Cost of Living - Est.
3,000
3,000
3,500
Total funds applied
$6,200
$6,200
$6,700
Cash on Hand (Shortage)
($ 200)
or Overage
$ 300
$ 300
Net Shortage - 1947 to 1953, inclusive
Add to 1954 shortage
1955 to 1957 overage applied to 1958 shortage
* Shortage
Overage
Cash on hand estimated at 1/1/59
ESTATE OF MATTHEW J. NASDEO, DECEASED Source and Application of Funds
Sources
1952
1953
1954
Wages Gross
$3,900
$3,900
$ 4,200
Expense Reimb
2,600
2,600
2,600
Gross Rents
Mtge. Rec. Barbara-Est. Prin.
400
Mtge. Rec. Barbara-Int. Est.
200
Total Sources
6,500
6,500
7,400
Application
Payroll Deductions Est.
$ 600
$ 600
$ 700
Car Exp. (?) - Entertainment, etc.
2,600
2,600
2,600
Rental Expense
Add Tax - 1955
Add Tax - 1956
Increase in Bank Bal.
1955 Cadilac
Barbara Mtge.
9,000
Brick House Purchased
5,000
Frame House Purchased
4,100
Balance of Tax
*** Cash Cost of Living - Est.
3,500
3,500
3,500
Total funds applied
$6,700
$6,700
$24,900
Cash on Hand (Shortage)
($ 200)
($ 200)
($17,500)
or Overage
Net Shortage - 1947 to 1953, inclusive
Add to 1954 shortage
$ 400
1955 to 1957 overage applied to 1958 shortage
* Shortage
* ($17,900)
Overage
Cash on hand estimated at 1/1/59
*244 ESTATE OF MATTHEW J. NASDEO, DECEASED Source and Application of Funds
Sources
1955
1956
1957
Wages Gross
$ 5,200
$ 5,200
$ 7,450
Expense Reimb
2,600
2,600
2,600
Gross Rents
1,920
1,920
1,920
Mtge. Rec. Barbara-Est. Prin.
800
850
900
Mtge. Rec. Barbara-Int. Est.
350
325
300
Total Sources
10,870
10,895
13,170
Application
Payroll Deductions Est.
$ 800
$ 800
$ 1,500
Car Exp. (?) - Entertainment, etc.
1,400
1,400
2,600
Rental Expense
479
479
479
Add Tax - 1955
Add Tax - 1956
Increase in Bank Bal.
500
500
1955 Cadilac
4,300
Barbara Mtge.
Brick House Purchased
Frame House Purchased
Balance of Tax
179
179
*** Cash Cost of Living - Est.
4,000
4,000
4,000
Total funds applied
$10,979
$ 7,358
$ 9,258
Cash on Hand (Shortage)
($ 109)
or Overage
$ 3,537
$ 3,912
Net Shortage - 1947 to 1953, inclusive
Add to 1954 shortage
1955 to 1957 overage applied to 1958 shortage
* Shortage
**
Overage
Cash on hand estimated at 1/1/59
ESTATE OF MATTHEW J. NASDEO, DECEASED Source and Application of Funds
Sources
1958
Wages Gross
$ 6,500
Expense Reimb
2,600
Gross Rents
1,980
Mtge. Rec. Barbara-Est. Prin.
1,000
Mtge. Rec. Barbara-Int. Est.
250
Total Sources
12,330
Application
Payroll Deductions Est.
$ 1,400
Car Exp. (?) - Entertainment, etc.
1,425
Rental Expense
549
Add Tax - 1955
715
Add Tax - 1956
556
Increase in Bank Bal.
5,358
1955 Cadilac
Barbara Mtge.
Brick House Purchased
Frame House Purchased
Balance of Tax
*** Cash Cost of Living - Est.
4,000
Total funds applied
$14,003
Cash on Hand (Shortage)
($ 1,673)
or Overage
Net Shortage - 1947 to 1953, inclusive
Add to 1954 shortage
1955 to 1957 overage applied to 1958 shortage
* Shortage
Overage
Cash on hand estimated at 1/1/59
$ 5,667
*245 329 The source and application of funds statement showed that the sources of funds for the years 1947 through 1953 ($41,600) were substantially equal to the application of funds ($42,000) for the same years. However, for the year 1954 the statement showed a disparity between sources of funds ($7,400) and the application of funds ($24,900), resulting in untraced sources of $17,500. The statement for the remaining years, 1955 through 1958, showed an excess of sources of funds ($47,265) over application of funds ($41,598), leaving a balance of cash on hand on January 1, 1959, of $5,667. In making up the source and application of funds statement for the years 1947 through 1958, Lazarus was able to obtain copies of Matthew's tax returns only for the years 1955, 1956, and 1958. *246 Lacking more complete information, Lazarus resorted to estimating certain figures, such as for cost of living in all the years covered in the statement. Lazarus did not receive all the information on Matthew's several bank accounts that he requested. Lacking full information regarding these accounts, he did not consider bank balances or activity in any of Matthew's bank accounts in the preparation of the source and application of funds statement. Included in the information that Lazarus was aware of but did not consider were Matthew's savings accounts at the National Bank of New Jersey, New Brunswick, N.J., and the First National Bank, Bound Brook, N.J. The National Bank of New Jersey account was apparently opened on April 14, 1945, with a deposit of $793.60 and the balance in that account increased to $12,101.05 by the end of the year 1946. At the end of 1946, Matthew had a total of $12,601.05 in these two accounts from which he withdrew $7,900 in 1947. The only apparent activity in either account from January 1, 1948, until Matthew's death in 1960 was the crediting of interest and two deposits totaling $550 in his account at the National Bank of New Jersey. Lazarus' investigation *247 and records began with the year 1947; he had no information as to the amount of cash Matthew had on hand on January 1, 1947; he had no idea of the amount of Matthew's original deposit in the safe deposit box; he did not know or even estimate what Matthew's net worth was at any time other than at the date of his death as reflected by the estate tax return; he had no idea whether or not Matthew might have had on hand much more than the $17,500 applied in excess of his apparent sources in 1954; he had never heard of A.R. Nasdeo, Inc.; and he did not check any records to see if Matthew ever had any type of business income other than salary or wages. Lazarus made no test for the determination of the source of the $33,020 found in 1960 other than the source and application of funds statement for the years 1947 through 1958. Based solely on this statement, however, he determined that the $33,020 had to be acquired in 1959, even though no source and application of funds test was made for either that year or for 1960. This determination was based on the fact that he believed that the results of his test showed that this sum could not have been acquired before 1959. And since, according to *248 his test, it was acquired in that year, it should be taxable in that year. Opinion Respondent has determined that the $33,020 found in Matthew's safe deposit box after his death in 1960 was taxable income in the previous year, 1959. This determination is clothed with a presumption of correctness and the petitioner ordinarily has the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111 (1933); Helvering v. Taylor, 293 U.S. 507 (1935); Rule 32, Tax Court Rules of Practice.Petitioner can sustain this burden either by showing that the $33,020 was not acquired in 1959 or by proving that the respondent's determination was arbitrary and excessive. Helvering v. Taylor, supra; Greenwood v. Commissioner, 134 F. 2d 915 (C.A. 9, 1943); Cohen v. Commissioner, 266 F. 2d 5 (C.A. 9, 1959); and Ross Bowman, 17 T.C. 681 (1951). We believe that petitioner has sustained his burden in both respects. The petitioner's burden, made even more onerous by the death and consequent unavailability of Matthew, has been somewhat mitigated by the fact that we would not be justified in drawing the same unfavorable inferences *249 from his failure to offer a complete explanation of the source of the $33,020 in this case as we would in the case of a living taxpayer. [2] Furthermore, "The law imposes much less of a burden upon a taxpayer who is called upon to prove a negative - that he did not receive the income which the Commissioner claims - than it imposes upon a taxpayer who is attempting to sustain a 330 deduction on his income tax return." Weir v. Commissioner, 283 F. 2d 675, 679 (C.A. 6, 1960). See also Taylor v. Commissioner, 70 F. 2d 619, 621 (C.A. 2, 1934), affd. 293 U.S. 507. Thus, although petitioner has not shown us in which year or years the $33,020 was actually acquired, we believe he has adequately proved that Matthew did not acquire it in 1959. Matthew was approximately 72 years of age in 1959. He had been hospitalized several times that year and apparently even when he was not in the hospital he was too weak to drive a car or even climb steps. It is inconceivable to us that he could have acquired such a large sum in his physical condition, particularly in view of the fact that *250 he apparently had no salary or wages other than from his union and there is nothing in the record to indicate any other source of income such as from gambling. In the notice of deficiency respondent determined the amounts of income Matthew received in 1959 from wages, rents, interest, and excess of reimbursements over business expenses, which petitioner does not dispute. These are clearly sources of income. In addition respondent determined that the amount of $33,020 representing cash funds found in a safe deposit box was taxable as ordinary income. While deposits in a bank account might suggest that the amounts thereof were current income, see Hague Estate v. Commissioner, 132 F. 2d 775, the mere existence of a cash fund with no explanation of when it was accumulated does not even suggest that it all represented current income. Revenue Agent Lazarus testified that he determined (from his source and application of funds test) that the $33,020 had not been previously taxed and since Matthew last visited the safety deposit box in 1959 he "taxed it in 1959." This indicates both an arbitrary and an erroneous determination and, under the circumstances, also an obviously excessive *251 one. There is no hint in the record of a possible source of this much income to Matthew in 1959. Furthermore, even if Matthew had acquired this sum in 1959 rather than in a previous year or years, he would have had to have placed it in the box on September 7 of that year, since that was the date of his only visit to the box in 1959. The only evidence in this regard was the uncontradicted though self-serving negative reply that Albert gave to the question of whether Matthew was carrying anything in his hands as he entered the bank. We see, however, no reason for not giving weight to this statement in light of the fact that Albert's testimony is almost entirely uncontradicted and there is nothing in the record to cause us to question his credibility as a witness. It is at most doubtful that Matthew could have carried this amount in large bills concealed in one or several pockets. We are convinced that Matthew did not acquire $33,020 of taxable income from unexplained sources between January 1 and September 7, 1959. Respondent determined that the $33,020 should be included in petitioner's income for the year 1959 because Lazarus' test showed that he could not have received it in prior *252 years and that it had not previously been taxed. We believe that under the circumstances this determination was arbitrary and unreasonable. Respondent attempted to prove, by his source and application of funds statement, that the $33,020 was not acquired in the years 1947 through 1958. Recognizing that Lazarus' job in determining when this cash horde might have been accumulated, and the preparation of this statement, was made difficult by the apparent unavailability of any of Matthew's records for prior years, and of his tax returns for any prior years except 1955, 1956, and 1958, we nevertheless feel that a little greater effort on his part, and the use of all the information he did have available, would have produced a more accurate source and application of funds statement and a better indication of whether Matthew could have had this much additional income in 1959. Respondent determined from Lazarus' statement, which is admittedly based largely on estimates, that Matthew could not have accumulated this cash in the period 1947-1958. Although respondent does not appear to have extended his source and application of funds statement into the year 1959, it is reasonable to assume *253 that such a method of testing, if of any value at all for any year, would more readily indicate whether Matthew could or could not have received all of this income in 1959, when more specific information should have been available. Respondent was apparently able to determine Matthew's income from 1959 from known sources without the benefit of a tax return and without consulting with members of Matthew's family or with his employees. Having gone this far it seems likely that respondent could also have discovered whether there was any possible source from which Matthew could have received this much additional income in 1959, 331 which was far in excess of any income respondent claims he received in any year from 1947 through 1958. The method used and efforts made by Lazarus to determine Matthew's true income for 1959 lack a great deal in supporting a presumption of correctness in respondent's determination. Referring to the source and application of funds statement itself and other information that appears, from the rather meager record in this case, to have been available to Lazarus, we mention below a few of the reasons we do not think Lazarus' testing method was a reasonable *254 basis for concluding that the entire $33,020 in cash was income received by Matthew in 1959. Respondent determined that the $33,020 was taxable in 1959, not by showing that it was received in that year but by attempting to show that it was not received in any other year. The source and application of funds test started with the year 1947 because that was the year after Matthew rented the safety deposit box. But even if we accept the statement as correctly reflecting the flow of cash for the years 1947-1958, this would not show that Matthew did not have a net worth at the beginning of 1947 which was adequate to account for the $33,020 in 1959. Matthew was 58 years old in 1946 and had been gainfully employed all his adult life. The records of the two New Jersey banks indicate that Matthew deposited more than $12,000 of surplus funds in one of those accounts between April 14, 1945, and the end of 1946 and had $12,600 in the two accounts at the beginning of 1947; and despite the fact that Matthew withdrew $7,900 from these accounts in 1947, Lazarus did not credit this as a source of funds in that year. Respondent explains this by claming that whatever cash Matthew had at the beginning *255 of 1947 would have been absorbed in 1954 when Matthew spent $17,500 more than respondent claims he received. But this is pure speculation because Lazarus apparently made no effort to determine what assets Matthew had at the beginning of 1947. He was not aware of the trucking business which Albert testified was liquidated in 1954 or 1955 with most of the proceeds going to Matthew to repay him his investment in the business. All of the source-of-income figures for the years prior to 1954 appear to be estimates, as do most of the "application" figures, so the statement for the first 7 years really does not mean much. We note that for all years except the years for which Lazarus had tax returns available, the statement charges Matthew with using all of the expense reimbursement funds he received, while in each of the years 1955, 1956, and 1958 Matthew apparently received expense reimbursements of about $1,200 over his expenditures. Cash living expenses were all estimated. And despite the fact that Lazarus' statement reflects that Matthew should have had cash on hand at the beginning of 1959 in the amount of $5,667, we find no evidence that this was given consideration as a possible source *256 of a part of the $33,020 found in the safety deposit box. For the above and other reasons we think Lazarus' source and application of funds statement was not a reliable basis for concluding that Matthew could not have acquired the $33,020 prior to 1959. It being very unlikely, in view of Matthew's age, health, and lack of activity, that he could have received this $33,020 as additional income during the first 9 months of 1959, and there being no apparent source from which he could have received it, we must conclude that respondent's determinations that this entire amount was additional taxable income to Matthew in 1959 was arbitrary and unreasonable. Respondent places considerable reliance on two Memorandum Opinions of this Court [3] in which amounts found in the decedents' safe deposit boxes after their respective deaths were found to be taxable income. However, we feel that the respondent's reliance is misplaced. In both of those cases and unlike the case at bar the circumstances indicated likely sources of the amounts that were discovered. It is well settled that "proof that bank deposits were made is not enough to show the receipt of income and, a fortiori, of taxable income *257 [unless] the circumstances surrounding the deposit and withdrawal of money in and from bank accounts may well give such character to the transactions that the Commissioner would be justified in determining that some, or all, of the deposits were income." Hague Estate v. Commissioner, supra.See also Goe v. Commissioner, 198 F. 2d 851 (C.A. 3, 1952), and Jacobs v. United States, 126 F. Supp. 154 (Ct. Cl. 1954). [4] While in the Hague case, where, as in the case at bar, petitioner had the burden of proof, the Commissioner was upheld in determining that certain unexplained deposits in a bank account were taxable income to 332 the taxpayer, there were actual records of the dates and amounts of the particular deposits and there were circumstances which supported the Commissioner's determination. In the case at bar, however, not only are there no such circumstances but in addition there is no record of when the cash was placed in the safe deposit box. It is enough that *258 we have found the respondent's determination to be arbitrary and excessive. Although Matthew might have acquired some taxable income from unexplained sources in 1959, it is not necessary for us to decide this question for, having proved that respondent's determination is invalid, petitioner is not required to prove that he owes nothing, or if liable at all, the correct amount of his tax liability. In Helvering v. Taylor, supra at 514, the Court stated: Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid * * *. But where, as in this case, the taxpayer's evidence shows the Commissioner's determination to be arbitrary and excessive, it may not reasonably be held that he is bound to pay a tax that confessedly he does not owe, unless his evidence was sufficient also to establish the correct amount * * *. See also Federal National Bank of Shawnee, Oklahoma v. Commissioner, 180 F. 2d 494 (C.A. 10, 1950). Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
***. Estimated amounts increased due to inflation.↩
*. Shortage - attributed to assets purchased - unable to establish liabilities encumbering these same assets, if liability did in fact exist, then payments of liabilities during succeeding years 1955-56-57 would eliminate substantially estimated 12/31/58 cash on hand. ↩
**. No visits to safe deposit box during these years per visitation record inspected. ↩
2. See Estate of Gladys Horwitz, T.C. Memo. 1965-269↩.
3. Estate of Frank Scotto, T. C. Memo. 1950-255, and Evelyn Hickok, T. C. Memo. 1952-5↩. 4. See Estate of Gladys Horwitz, supra.↩