SAMUEL WELLS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SAMUEL WELLS and ANN WELLS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wells v. Commissioner
Docket Nos. 7832-79, 7833-79.
United States Tax Court
T.C. Memo 1983-788; 1983 Tax Ct. Memo LEXIS 1; 47 T.C.M. (CCH) 796; T.C.M. (RIA) 83788; December 29, 1983. Marvin J. Garbis and Carolyn J. McElroy, for the petitioners. Daniel J. Wiles, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent *2 determined a deficiency of $250,760.40, and an addition to tax pursuant to section 6653(b) [1] of $125,380.20 for Samuel Wells' 1971 tax year, deficiencies of $253,497.33 and $250,170.37, respectively, for the 1972 and 1973 tax years of Samuel Wells and Ann Wells, and additions to tax pursuant to section 6653(b) of $126,748.66 and $125,085.18, respectively, for 1972 and 1973. At issue is: (1) whether the deficiency notices concerning the years in issue were arbitrary and erroneous; (2) whether respondent correctly calculated petitioners' income from their participation in a lottery enterprise; and (3) whether the underpayments for the years in issue were due to fraud within the intendment of section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided in Baltimore, Maryland, when the petitions in these cases were filed.Petitioner Samuel Wells (hereinafter Samuel) failed to file a Federal income tax *3 return for 1971. Samuel and Ann Wells (hereinafter Ann) filed joint returns for 1972 and 1973. The typical illegal lottery (numbers) operation in Baltimore, Maryland, in the early 1970's was organized as follows: bets, in the form of three digit numbers, were accepted by individuals known as writers. Bets received by writers were then turned in to a station. The station kept detailed records of bets turned in by its writers. Money received by a station was turned in to the backer. The backer served as the underwriter for the lottery. He received all money bet, paid salaries to writers and stations, distributed funds to stations to enable them to pay off winning bettors, and kept whatever was left over. To avoid detection, backers typically refrained from making their phone numbers known to employees, and simply called their stations to receive lists of bets made. The average amount of a bet in such lotteries was 25 cents or 50 cents. Bettors often made combination bets of various types. For example, a 50-cent combination bet on the number 123 cost $3, and represented a 50-cent bet on each of 123, 321, 231, 132, 213, and 312. Lotteries were typically operated six days a week, *4 52 weeks a year. On December 11, 1971, Samuel was involved in an automobile accident in Prince George's County, Maryland. Sergeant K.L. Tregoning of the Maryland State Police responded to the accident and after an on-scene investigation arrested Samuel for possession of untaxed whiskey, lottery slips and a concealed weapon.A number of lottery slips were seized from Samuel as well as $15,939 in United States currency and an adding machine. The seized lottery slips were found in brown paper bags, in Samuel's wallet, and in manilla envelopes under the seat of the truck. Only the slips contained in the brown paper bags and in Samuel's wallet were used by the Maryland police to tabulate the amount of lottery play represented by the slips in Samuel's possession. It is not clear why the slips found in the manilla envelopes were not considered by the Maryland police. The lottery slips found in brown paper bags in Samuel's truck, and in his wallet, were given to Trooper Gary Sherman of the Maryland State Police for tabulation. Trooper Sherman had received special training in interpreting and tabulating lottery slips. Trooper Sherman determined that the aforementioned lottery slips *5 included nine slips dated December 11, six slips dated December 10, ten slips dated December 8, and two undated slips. Trooper Sherman tabulated each slip, and concluded that the nine slips dated December 11 represented bets totaling $1,935.75, that the six slips dated December 10 represented bets totaling $1,673.33, that the ten slips dated December 8 represented bets totaling $1,918.40, and that the two undated slips represented bets totaling $53.80. By adding these totals together, dividing by three, and then multiplying by three hundred, the number of days per year Trooper Sherman believed the normal lottery operated, he arrived at a yearly total of $558,126 in bets. The slips analyzed by Trooper Sherman were presented in evidence in Samuel's criminal trial in 1972, and were subsequently destroyed by the Maryland State Police. On March 20, 1972, after a trial before the District Court of Maryland, Samuel was found guilty of violating the Md. Ann. Code, art. 27, sec. 362 (1957), possession of lottery slips. [2]
*6 In July 1973, Sergeant Larry Jones of the Baltimore City Police Department was a member of the criminal investigation division of the vice unit. At that time he received information from an informant concerning an illegal lottery operation.Sergeant Jones had the informant dial telephone number 566-7198, which he subsequently determined to be listed to Samuel Wells. A female answered the phone, whereupon the informant gave an identifying code number and proceeded to place a series of numbers bets. Sergeant Jones then wrote an affidavit requesting a search and seizure warrant. A warrant was issued on the 25th of July 1973, and on that same day, at 12:45 p.m., Sergeant Jones and others served the warrant upon Samuel and Ann's residence, 116 N. Smallwood Street, Baltimore, Maryland. When Sergeant Jones entered the premises, Ann was found in the basement with a telephone. Near Ann were found several pads containing lottery numbers and a bag containing four dream books. [3] Also found were four nonconventional lottery slips, a notebook indicating money played or money owed, and a notebook containing numbers and phone numbers.As a result of this raid, Ann was arrested and subsequently *7 convicted, on August 15, 1973, of the crime of setting up and maintaining an illegal lottery operation in violation of Md. Ann. Code, art. 27, sec. 360 (1957). [4] She was fined $500 and paid court costs. No appeal was taken. Detective Arnold Adams of the Baltimore Police Department was present on August 13, 1973, while an informant phoned *8 566-7198, petitioners' phone number, and placed lottery bets totaling $6. Detective Adams then took the phone and heard a female confirm the bets. Detective Adams observed petitioners' home between August 20 and September 4, 1973, and saw a white male enter petitioners' house with Samuel between 12 and 2 p.m. on each Wednesday. On each such visit the white male remained in the house 15 minutes and left with a brown paper bag. The following colloquy between Ann and an informant, as reported by Detective Adams, occurred on September 12, 1973: my informant then called the number 566-7198 but the line was busy. Three more attempts were made to call the number but the line (phone) was busy. After waiting fifteen minutes a fifth call was placed and the phone rang. A female voice answered and my informant stated "you're busy today, aren't you." The female voice stated "Who is this" and my informant identified himself and she proceeded to say "Very busy". "I just got in and the phone has been ringing with play ever since". My informant proceeded to play 300 - 950 - and 210 for a dollar each. The female voice repeated the numbers to me and I sated "Yes" and hung up. Detective *9 Adams prepared an affidavit requesting a search and seizure warrant, and a warrant was granted by a judge of the District Court of Maryland on September 19, 1973. On that same day officers of the Baltimore City Police Department served the warrant upon petitioners' residence at 116 N. Smallwood Street. As a result of the aforementioned raid, Ann was arrested and subsequently convicted, on October 2, 1973, of the crime of setting up and maintaining an illegal lottery operation in violation of article 27, section 360. No appeal was taken. On December 13, 1973, the Baltimore City Police Department, pursuant to authorization given December 12, 1973, by a judge of the District Court of Maryland, served a search and seizure warrant upon petitioners' residence at 116 N. Smallwood Street. Included in the request for the aforementioned warrant were allegations by the affiants that-- on Tuesday December 11, 1973 at 10:34 a.m., your affiant Ordway intercepted and recorded a telephone call as it originated from 391-6084 to a female recipient identified by the name "Hattie" at telephone number 566-7198; that during this conversation the female recipient placed a long series of lottery *10 wagers with the male caller; that this call was terminated at 10:46 a.m.; that on Wednesday December 12, 1973 at 10:54 a.m. your affiant Ordway intercepted and recorded a telephone call as it originated from a male at telephone number 391-6084, to a female identified by the name "Hattie" at telephone number 566-7198; that during this conversation the male caller accepted a long series of lottery wagers from the female recipient; that your affiants caused a search of the current records of the Chesapeake and Potomac Telephone Company, Baltimore, Maryland and thus determined service via 566-7198 is presently extended in the name Samuel Wells, 116 North Smallwood Street, Baltimore, Maryland; Detective Arnold Adams was among the officers who raided petitioners' residence on December 13, 1973. In the course of that raid, he confiscated 26 payoff sheets and money due sheets showing $23,738.05 in payoffs and money due, and 17 nonconventional lottery slips showing apprximately 2,500 numbers wagered totaling $6,954.40 in play. Detective Adams observed, but did not confiscate, two plastic shopping bags containing U.S. currency stacked in groups of $20 bills, $10 bills, $5 bills, and *11 $1 bills. As a result of this raid both petitioners were arrested and each was subsequently convicted on January 23, 1974, of the crimes of setting up and maintaining an illegal lottery operation and possession of lottery slips in violation of article 27, sections 360 and 362. Each paid fines of $2,000 plus court costs. No appeals were taken.
On July 25, 1975, the Baltimore City Police Department, pursuant to authorizations given by a judge of the Supreme Bench of Baltimore City, served search and seizure warrants upon petitioners' residence at 116 N. Smallwood Street, at a garage used by petitioners, 2200 Vine Street, and at petitioners' grocery store, 2149 W. Lexington Street. On February 11, 1981, the Baltimore City Police Department, pursuant to authorization given by a judge of the Supreme Bench of Baltimore City, served a search and seizure warrant upon petitioners' residence at 116 N. Smallwood Street. During 1971 through 1973 petitioners participated in the operation of an illegal lottery in Baltimore. During the period that the petitioners so participated, the lottery operated six days a week. The petitioners' participation in the lottery was conducted from 116 *12 N. Smallwood Street and 2200 Vine Street, both in Baltimore, Maryland. Bets were received by petitioners by telephone and personal contact. Lottery slips of this operation were usually not kept by petitioners longer than one day. After that, the records were destroyed.
The average payoff on a winning number in the lottery enterprise in which petitioners participated was 500 to 1. Petitioners' tax returns for 1972 and 1973 were prepared by J. Royce Lokeman from information supplied by petitioners. The records and information supplied to Lokeman concerned income from a grocery store operated by petitioners and personal expenses.Petitioners did not advise Lokeman of their participation in an illegal lottery. Samuel met with Internal Revenue Service Agent Carl Underwood in November 1974, and several times thereafter. Samuel told Agent Underwood that he filed no 1971 returns because he had no income in that year, and stated that he lived off funds Ann earned by operating a corner grocery store. Samuel explicitly denied that he was involved in a lottery operation or that he had any income in 1974 from operating a lottery. Samuel also denied having any savings accounts or any *13 assets located outside of Maryland, both of which assertions were false. Despite Agent Underwood's attempts to determine the source and extent of Samuel's funds, Samuel failed to disclose that he had a large amount of cash in his house in late 1973. OPINION Petitioners contend that the deficiency notices in these cases are arbitrary and erroneous because they do not allow deductions for amounts paid winning bettors in the lottery operation in which petitioners were engaged, and that the burden of going forward with the evidence with respect to the entire deficiencies asserted therefore shifts to respondent. [5] At trial, the parties stipulated that 50 percent of gross receipts of the lottery enterprise in which petitioners were involved were paid to winning bettors. *14 Petitioners rely on Cohen v. Commissioner,266 F.2d 5 (9th Cir. 1959), revg. T.C. Memo. 1957-172. [6] The taxpayer in that case was a "betting commissioner" who obtained "opposite parties to a wager, receiving for his services a 'commission' or fixed percentage of the amount involved in the wager." Cohen v. Commissioner,T.C. Memo. 1957-172. During the years in issue, the taxpayer in Cohen,supra, did not retain records or books of account pertaining to his activity as a betting commissioner, and it was therefore impossible to make an accurate determination of the amount of commissions he received. In determining his deficiency in tax, respondent calculated gross receipts from his activities as a commissioner, but refused to allow deductions for payouts or losses because no substantiation was offered. *15 The taxpayer argued that respondent's deficiency notice was arbitrary and erroneous, and that respondent's deficiency notice therefore lost its presumption of correctness. We rejected this argument, stating: Petitioner next urges that respondent was arbitrary in treating deposits as gross income, but failing to allow any deductions or eliminations for "pay outs." Petitioner argues that respondent must have known that the very nature of petitioner's business was such that pay outs were necessary. As will appear, infra, we have materially reduced respondent's determination. Again, however, this is not tantamount to a holding that the determination was arbitrary or invalid in whole or in part. Petitioner did not offer any substantiation of pay outs. He did not maintain any records from which pay outs could be calculated. The fact that his failure to do so was because of fear that they might be found by police authorities, and used in the prosecution of petitioner, and others operating illegal enterprises is hardly binding upon (or in any sense appealing to) respondent or to us. [Cohen v. Commissioner,T.C. Memo. 1957-172.]
However, the Ninth Circuit *16 reversed, stating (266 F.2d at 11): The Tax Court found the Commissioner's method of determining deficiencies incorrect in two important respects. The Commissioner's method was also criticized as being "harsh and unrealistic." Making its own determination on a basis which made every possible assumption against Cohen, the Tax Court reduced the deficiency and penalty assessment for the three years from $1,790,000 to $260,000. The facts of record fully substantiate the Tax Court's criticism of the Commissioner's method. They would have required that the Commissioner's determination be set aside even if the Tax Court had not done so. The Commissioner's determination is invalid when it is arbitrary or erroneous. Greenwood v. Commissioner, 9 Cir. 134 F.2d 915, 919. Whether or not the Commissioner's determination in this case was arbitrary, it was at least erroneous in substantial respects. Cohen accordingly met his burden of proving that the Commissioner's determination was invalid. In view of these circumstances the further and inconsistent holding of the Tax Court to the effect that the Commissioner's determination was not invalid must be disregarded. *17 The Ninth Circuit began its analysis in Cohen by noting that "[a]t the outset of a Tax Court proceeding to redetermine a tax deficiency, the Commissioner's determination is presumed to be correct." 266 F.2d at 11.It then stated, relying on Helvering v. Taylor,293 U.S. 507, 515 (1935), that "[w]hen the Commissioner's determination has been shown to be invalid, the Tax Court must redetermine the deficiency," (266 F.2d at 11) and went on to hold, in the passage cited above, that the Commissioner's determination of the taxpayer's tax deficiency was erroneous, and that the case must be remanded for a determination, based solely on a finding of fact, of the deficiency in tax. 266 F.2d at 12. Neither Taylor nor Cohen supports petitioners' contention that if a taxpayer meets his burden of proving respondent's deficiency notice erroneous in one respect, the burden of going forward with the evidence with respect to the entire deficiency is therefore shifted to respondent.Taylor and Cohen make clear that the taxpayer has the initial burden of proving respondent's determination erroneous. Once that burden has *18 been met for a part of respondent's determination, as it was in Taylor and Cohen, the taxpayer must prevail unless respondent introduces sufficient countervailing evidence, [7] but only for those aspects of respondent's determination as to which the taxpayer has met his initial burden of proof. Clark v. Commissioner,266 F.2d 698, 707 (9th Cir. 1959); Estate of Mary Mason v. Commissioner,64 T.C. 651, 659 (1975), affd. 566 F.2d 2 (6th Cir. 1977); [8] cf. Silverman v. Commissioner,538 F.2d 927, 930 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. *19 In the case before us, petitioners have met their burden of proving that respondent erred in his deficiency notice by failing to allow deductions from gross receipts for amounts paid to winning bettors in calculating petitioners' gross income. Petitioners still have their usual burden of proving error in respondent's computation of their gross receipts for the years in issue. Clark,supra;Estate of Mary Mason,supra.[9] Rule 142(a). Although respondent presented evidence at trial on the issues raised in the deficiency notices, he now contends that since petitioners rested at trial without presenting evidence, and since the burden of proof is upon them, a directed verdict should be entered for respondent. To support this contention, respondent relies on rule 50(a), Federal Rules of Civil Procedure, which provides: [10]
(a) Motion for Directed Verdict: When Made; Effect. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved *20 the right so to do and to the same extent as if the motion had not been made. * * * A motion for a directed verdict shall state the specific grounds therefor.* * * Respondent admits that he failed to make a motion for directed verdict, but suggests that his motion at the close of petitioners' case for a ruling on the issue of which party bears the burden of going forward should now be treated as a motion for directed verdict. This we decline to do. [11] We will instead examine the evidence elicited at trial to determine whether petitioners have met their burden of proof. *21 When no method of accounting has been used by a taxpayer, the computation of his taxable income shall be made under such method as, in the opinion of respondent, does clearly reflect income. Sec. 446(b). Respondent chose to employ the "projection method" [12] to compute petitioners' taxable income, basing his calculation upon some of the lottery slips found in possession of Samuel on December 11, 1971. [13] The burden of proof is upon petitioners to prove error in respondent's computation. Rule 142(a). *22 The parties stipulated that winning numbers in the lottery operation in which petitioners were involved were paid off at 500 to 1. The odds against winning (hitting one three-digit number between 000 and 999) were 1,000 to 1. Respondent now concedes that a deduction of 50 percent of yearly receipts is allowable in calculating petitioners' taxable income for the years in issue, and we so hold. Petitioners contend respondent erred in assuming in his application of the projection method that Samuel and Ann were continuously engaged in lottery operations during the years in issue. Petitioners point out that there is no direct evidence indicating that they were involved in a lottery operation between December 1971 to July 1973, with the exception of two months in 1972 and ten months in 1973, that being the total time Samuel admits to having engaged in lottery operations. Samuel testified that he did not engage in lottery operations from late December 1971 until late 1972.He further testified that he spent one month or five weeks each year vacationing in South Carolina. We did not find Samuel to be a credible witness, and we accord no weight to his self-serving testimony. Since *23 petitioners have offered no other evidence tending to show when, if ever, petitioners were not engaged in lottery operations during the years in issue, we hold that petitioners have failed to meet their burden of proof. Rule 142(a). Petitioners contend respondent erred in including in his computations under the projection method the amount of play included in the undated slips found in Samuel's possession on December 11, 1971.The parties stipulated that lottery slips were usually kept no more than one day. We believe it is a fair inference that the undated slips reflected play for December 10 or 11. Petitioners also contend respondent erred in assuming that they were backers of the lottery in which they participated. [14] They base their argument that they were not backers on several grounds. Samuel testified that during the years in issue his only lottery income came from a 20-percent commission he received on bets he accepted as a writer, and from his salary as a station. He stated that he wrote bets totaling between $35 and $60 during each day he was active in the lottery, and that his weekly salary as a station was $25. As noted above, we did not find Samuel a credible *24 witness, and accord no weight to his testimony. Sergeant Jones, who was involved in one of the raids on petitioners' home, testified that the notebook containing numbers and phone numbers that was found in Ann's possession on July 25, 1973, indicated that Ann was a station. Petitioners also point out that the affidavit requesting the warrant granted on December 13, 1973, contained allegations that on December 11 and 12, 1973, a female identifying herself as "Hattie" received calls at 566-7198, petitioners' phone number, and on each occasion placed a long series of lottery wagers with a male caller. On cross-examination, petitioners elicited from respondent's witness, Sergeant Mastromatteo, the admission that the person accepting those wagers would probably have been the backer, and Hattie, the person placing the wagers from petitioners' phone, would *25 have been a station. Respondent bases his argument that petitioners were lottery backers on several facts of questionable significance, such as the fact that petitioners kept an adding machine and dream books in their residence, and upon the testimony of Detective Adams. Detective Adams testified that when he raided petitioners' residence on December 13, 1973, he found 26 payoff sheets and money due sheets showing $23,738.05 in payoffs and money due, and 17 nonconventional lottery slips showing approximately 2,500 numbers and $6,954.40 in play. According to Detective Adams, money due sheets were kept by backers to record the total dollar amount of bets received from writers, the amount of money received from writers, and the difference, if any, which would be recorded as money owed the backer. Based on this evidence Detective Adams opined that Samuel was a backer and that his lottery operation accepted wagers of between $10,000 and $15,000 a day. The question whether petitioners were backers during the years in issue is a close one since neither party presented conclusive evidence in support of its position. Where the evidence is in equipoise, as here, the party bearing the *26 burden of proof must fail. Accordingly, we find that petitioners have failed to carry their burden of proof on this question. Respondent has conceded that a 50-percent deduction for bets paid must be allowed petitioners if they were writers. This, coupled with the 30-percent deduction allowed for salaries, [15] leaves taxable income of 20 percent of the yearly receipts determined by respondent for the years in issue. Fraud
Fraud, within the intendment of section 6653(b), [16] is an intentional wrongdoing with the specific *27 intent to evade a tax believed owed. Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941).The required intent may be shown by circumstantial evidence and reasonable inferences drawn from the facts. Stone v. Commissioner,56 T.C. 213, 224 (1971); Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. 578 F.2d 1383 (8th Cir. 1978). Whether fraud exists with respect to an underpayment of tax is a question of fact, and the burden is on respondent to prove fraud by clear and convincing evidence. Sec. 7454(a); Stone v. Commissioner,supra at 220; Rule 142(b). *28 Samuel
Samuel has conceded that he had unreported lottery income in the years in issue. To establish fraud, respondent also must show that Samuel had the specific intent to evade a tax believed owed. Failure to report substantial amounts of income over a number of years is effective evidence of fraudulent intent. Gromacki v. Commissioner,361 F.2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Kalil v. Commissioner,271 F.2d 550 (5th Cir. 1959), affg. a Memorandum Opinion of this Court. We believe respondent has shown convincingly that Samuel's lottery income during the years in issue was at least substantial enough that he would not have simply overlooked it when he filed his returns in 1972 and 1973. Samuel's failure to file a return for 1971 is evidence of fraudulent intent for that tax year. Grosshandler v. Commissioner,75 T.C. 1, 19 (1980); Gemma v. Commissioner,46 T.C. 821, 834 (1966). Samuel admitted he participated in an illegal lottery operation during the years in issue, and during those years he was twice convicted for violating the Maryland lottery laws. Receipt of *29 income from illegal activity and failure to report that income alone do not establish fraud. They do, however, indicate a general disposition to defraud. [17]
Samuel met with Internal Revenue Service Agent Underwood in November 1974, and several times thereafter. Samuel told Agent Underwood that he filed no 1971 returns because he had no income in that year, and stated that he lived off funds Ann earned by operating a corner grocery store. Samuel explicitly denied that he was involved in a lottery operation and that he had any income in 1971 from operating a lottery. Samuel also denied having any savings accounts or any assets located outside of Maryland, both of which assertions were false. Despite Agent Underwood's attempts to determine the source and extent of Samuel's funds, Samuel failed to disclose that he had substantial amounts of cash in his house in late 1973. Agent Underwood was a credible witness, and we believe his testimony that Samuel attempted to hide income from him. Making false statements to Internal Revenue Service agents investigating tax returns *30 is an indicium of fraud. Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968). [18]
Samuel argues that it is not appropriate to conclude that because he attempted to hide illegal income from the Internal Revenue Service he was attempting to avoid a tax believed owed. According to Samuel, he was so unsophisticated that he did not appreciate the legal distinction between engaging in illegal activities and reporting illegal income to respondent. We are unable to accept the premise of this argument. While Samuel's demeanor at trial revealed a man remarkably lacking in savoir-faire, the record makes clear that in his own sphere Samuel possesses considerable business acumen. Even if he was only a writer and call-in-station during the years in issue, Samuel handled large sums of money on a daily basis, and kept meticulous, albeit short-lived, records. A desire to avoid criminal prosecution for lottery violations may have *31 partially motivated Samuel's refusal to disclose his lottery income to the Internal Revenue Service, but we are convinced that Samuel also hoped to avoid paying taxes believed owed on his ill-gotten gains. We conclude that the circumstantial evidence amassed by respondent suffices to prove clearly and convincingly that Samuel intended in each year in issue to avoid a tax believed owed. Ann
Respondent's entire argument concerning Ann's liability for the section 6653(b) addition to tax may be summarized as follows: Ann filed joint returns with Samuel for 1972 and 1973. She was directly involved in the lottery operation with Samuel. Respondent then concludes that Ann was surely aware of her responsibility to report her lottery earnings. This conclusion is not supported by the record. We agree that it appears likely that Ann intended to avoid a tax believed owed in 1972 and 1973. Mere suspicion, however, does not suffice to carry respondent's burden of proof. Ann was never interviewed by any of respondent's agents; she was not called as a witness and did not testify. We hold that respondent has failed to prove by clear and convincing evidence that Ann is liable for the *32 section 6653(b) addition to tax for 1972 or 1973. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Sec. 362. Possession of lottery tickets, records or money. If any person shall bring into this State any lottery ticket, policy, certificate or anything by which the vendor or other person promises or guarantees that any particular character, ticket or certificate shall in any event, or on the happening of any contingency in the nature of a lottery, entitle the purchaser or holder to receive money, property or evidence of debt, or if any person shall have in his possession in this State any book, list, slip or record of the numbers drawn in any lottery, whether in this State or elsewhere, or any book, list, slip or record of any lottery ticket, or anything in the nature thereof mentioned in this section, or of any money received or to be received from, or for the sale of any such lottery ticket or thing in the nature thereof as aforesaid he shall be liable to indictment, and upon conviction shall in the discretion of the court be fined any sum not exceeding one thousand dollars, or shall be imprisoned for a period not exceeding one year, or shall be both fined and imprisoned; provided, however, that this section shall not apply to any person who may have possession of any of the articles herein mentioned, for the purpose of procuring or furnishing evidence of violations of any of the provisions of law relating to lotteries, and also, this section shall not apply to any person in possession of a lottery ticket or slip issued by this State or any other government. * * *↩
3. Dream books are books explaining how to predict winning lottery numbers from one's dreams. ↩
4. Sec. 360. Keeping place for selling, etc., of lottery tickets. If any person shall keep any house, office or other place for the purpose of selling or bartering any lottery ticket, policy, certificate or any other thing by which the vendor or other person promises or guarantees that any particular number, character, ticket or certificate shall, in any event or on the happening of any contingency in the nature of a lottery, entitle the purchaser or holder to receive money, property or evidence of debt, he shall be subject to indictment, and upon conviction, he shall in the discretion of the court be fined a sum not exceeding one thousand dollars, or imprisoned for a period not exceeding one year, or he may be both fined and imprisoned.* * *↩
5. Petitioners do not contend that it was arbitrary of respondent to include receipts from their lottery enterprise in reconstructing their income. Petitioners thus do not fall within the rule of cases such as Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977); Carson v. United States,560 F.2d 693 (5th Cir. 1977), and Jackson v. Commissioner,73 T.C. 394 (1979), which hold that respondent cannot rely on the presumption of correctness where no evidence appears in the record linking the taxpayer to the income producing activity from which respondent alleges the taxpayer derived unreported income. The following justification has been offered for this rule: The government * * * takes the following bald, if not bold, position: "With respect to [the 1970-71] assessments, then, the Government relies entirely on the presumption of correctness." * * * Such a position, which would support the most arbitrary of assessments so long as the taxpayer found himself unable to prove a negative, frequently difficult in quite innocent circumstances, does not become the government's agents, and we readily reject it. [Citations omitted, Carson v. United States,560 F.2d at 698.] and the Commissioner must offer some foundational support for the deficiencly determination before the presumption of correctness attaches to it. After all, as the Court observed in Elkins v. United States,364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed. 2d 1669 (1960), "* * * as a practical matter it is never easy to prove a negative * * *." 364 U.S. at 218, 80 S.Ct. at 1444. * * * [Weimerskirch v. Commissioner,596 F.2d at 361↩.]
6. Petitioners also rely on the following language from a Memorandum Opinion of this Court: a petitioner, upon proving that respondent's determination is invalid and arbitrary--that is, that it has no rational foundation in fact and is based upon assumption which cannot be supported--has no burden of proving the correct amount of tax which he may owe, and * * * upon such a showing it is incumbent upon this Court to determine the facts from the available evidence of record without regard to the presumption of correctness generally attaching to respondent's determination. * * * [Shades Ridge Holding Co. v. Commissioner,T.C. Memo. 1964-275, affd. per curiam sub nom. Fiorella v. Commissioner,361 F.2d 326↩ (5th Cir. 1966).]
7. The burden is of course upon the taxpayer to establish the amount of any deduction claimed. Helvering v. Taylor,293 U.S. 507, 514 (1935); Clapp v. Commissioner,321 F.2d 12, 14 (9th Cir. 1963); Roberts v. Commissioner,62 T.C. 834, 836-837 (1974). For a discussion of the consequences of the location of the burden of proof see the concurring opinion by J. Tannenwald in Llorente v. Commissioner,74 T.C. 260, 272 at 273 n. 3 (1980), affd. in part, revd. in part, and remanded in part 649 F.2d 152↩ (2d Cir. 1981). 8. Hoffman v. Commissioner,T.C. Memo. 1960-160, affd. 298 F.2d 784↩ (3d Cir. 1962).
9. Hoffman,supra.↩
10. Respondent notes: The Tax Court Rules do not explicitly provide for this procedure but Rule 1 incorporates it stating "Where in any instance there is no applicable rule of procedure, the Court or the Judge before whom the matter is pending may prescribe the procedure, giving particular weight to the Federal Rules of Civil Procedure to the extent that they are suitably adaptable to govern the matter at hand." The Court has previously resorted to the Federal Rules and their interpretation to flush [sic] out its own rules. * * *↩
11. We need not address the issue of what course we would have followed had respondent moved for a directed verdict, stating the specific grounds therefor.↩
12. See Estate of Simkins v. Commissioner,T.C. Memo. 1978-338↩. 13. Respondent calculated Samuel's 1971 taxable income as follows: Bet slips: December 8, 1971
$ 1,918.40
December 10, 1971
1,673.33
December 11, 1971
1,935.75
Unknown date
53.80
Total:
5,581.28
Divided by 3 days of operation
3   Daily play
1,860.42
Days of operation
293   Yearly receipts
545,103.00
Less allowances to employees 30%
163,531.00
Adjustment
$381,572.00
Respondent calculated petitioners' 1972 and 1973 taxable income using slightly different assumptions: ↩
Bet slips: December 8, 1971
$ 1,918.40
December 10, 1971
1,673.33
December 11, 1971
1,935.75
Unknown date
53.80
Total inventory of bet slips
5,581.28
Divided by days of play inventoried
3   Average daily play
1,860.42
Times days in business week
6   Average weekly play
11,162.52
Times weeks of operation
52   Annual play
580,451.00
Less allowance to employees 30%
174,135.00
Adjustment for each of 1972 and 1973
$406,316.00
14. A lottery backer is the person who finances the lottery. He pays off winning bettors, and keeps what is left after operating expenses such as salary. A station is an employee of the backer responsible for collecting and tabulating lottery bets taken by writers. Writers are the people who actually receive bets from bettors.↩
15. On brief respondent asks us to disallow the 30-percent deduction he allowed for salary in the deficiency notices, on the ground that petitioners failed to prove they had any employees. Petitioners had no notice before or during the trial of this case that respondent intended to repudiate the deductions allowed in the deficiency notices, and thus had no incentive to attempt to prove up those deductions. We therefore will not allow respondent to deviate from the deduction for salary allowed in the deficiency notice. Estate of Horvath v. Commissioner,59 T.C. 551, 555 (1973); Brown v. Commissioner,T.C. Memo. 1979-443↩.
16. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩
17. Sullivan v. Commissioner,T.C. Memo. 1983-539↩, on appeal (1st Cir., Sept. 30, 1983).
18. Vella v. Commissioner,T.C. Memo. 1982-73; Sherman v. Commissioner,T.C. Memo. 1977-261; Moore v. Commissioner,T.C. Memo. 1977-275, affd. 619 F.2d 619↩ (6th Cir. 1980).